ASHE v. CAR. & N. W. RY. CO.

PAROL EVIDENCE—NONSUIT—LETTERS.—THE CONTRACT herein being contained in letters and they being silent on one point, parol evidence is admissible to show that such point was also contracted upon in parol, and this in connection with the letters make up a contract of the violation of which by defendant there is some evidence, and nonsuit was error.

Before WATTS, J., York, April, 1902. Reversed.

Action by W. N. Ashe, Jr., against Carolina and North-western Railway Company and J. R. Culp, Jr., agent. From judgment of nonsuit defendant appeals.

*Mr. W. W. Lewis,* for appellant, cites: *As to construction of contract:* 17 Ency., 9; 14 S. C., 162; 5 Rich. L., 189; 33 S. C., 215. *Any testimony pertinent to issues sends case to jury:* 38 S. C., 485; 39 S. C., 375; 40 S. C., 104; 41 S. C., 153.

*Mr. J. H. Marion,* contra (oral argument).

January 19, 1903. The opinion of the Court was delivered by

MR. JUSTICE GARY. The appeal herein is from an order of nonsuit. The complaint alleges that "on or about the 12th day of October, 1900, the defendant railway company, for value received, undertook and contracted with plaintiff to haul for plaintiff certain wood belonging to him from a point on said line of railway to Yorkville, in said county and State, and upon its arrival at the latter point to deliver the same to plaintiff. That in accordance with said contract, said defendant railway company did haul part of said wood to Yorkville, and immediately upon its arrival there the plaintiff paid and offered to pay to said defendant railway company, and tendered to it through its officers and agents authorized to receive same, * * * all sums of money which said defendant railway company was entitled to charge and receive, and all which plaintiff had agreed to pay to said defendant for hauling said wood to Yorkville, and plaintiff thereupon demanded the surrender and delivery to him of the wood so hauled and belonging to plaintiff, but said defendant railway company, through its officers and agents and the defendant, J. R. Culp, acting together, took into and retained in their possession and utterly refused and neglected to surrender and deliver the same to plaintiff, and refused and neglected to allow plaintiff to have said wood or any part thereof,

although plaintiff had in all respects fully complied with his part of the agreement with said railway company."

The answer was a general denial. The grounds of the motion for nonsuit and the reasons assigned by his Honor in granting it are thus stated in the record: "Defendant's counsel: If your Honor please, I desire to enter a motion for a nonsuit on the ground that the plaintiff here has not proven that the failure to deliver this wood to him by the defendant railroad company was in violation of any contract or the condition of any contract entered into by Mr. Ashe with the defendant railway company, or the failure to deliver the wood, which he alleges is the cause of his damage—the failure to deliver the wood after it had been brought from Guthriesville, or from Lowrysville to Yorkville, on the day in question. His cause of action is the failure of the railway company to deliver to him the wood has caused this damage. Now, if your Honor please, it is incumbent upon him to show that the failure of the railway company to deliver to him the wood was in violation of either its legal duty or in violation of some specific contract or special contract entered into by and between the railway company and Mr. Ashe with reference to this particular delivery of wood. Now, if your Honor please, the contract between these people is included in the writings before the Court, and I respectfully submit that anything else that the witness, Mr. Ashe, has stated here as to any conversation with Mr. Nichols and Mr. Culp has not shown that there was at any time anything more than an understanding on Mr. Ashe's part of the effect of certain conversations or transactions. So far as the proof of any contract other than is entered into here by and between these people in the letters, there is not a *scintilla* of evidence that is worthy of consideration by a jury. The Court: Gentlemen, there is nothing ambiguous in the contract, so far as the letters make it out here. The correspondence makes it out that the railroad company agreed to furnish cars for ten hours for $55, and over that they were to pay more—that is, if they had it longer than ten hours. Well,

now, what does it mean by the payment of $55? If a man says he offers a piece of property for a certain amount of money, that means a cash transaction. These railroad officials agreed to furnish this train for $55. They had a right to demand that $55 in cash, when they demanded the cash. If they went and loaded up the train with wood, they had a right to demand the $55 before delivery of the freight, if there was nothing to show that was done on a credit. The letters are silent as to when this money was to be paid, and in the absence of any express contract along that line, the presumption of law is, that it was a cash transaction, and the railroad had a right to demand the cash at any time. Before they furnished the cars, before they actually turned them over, or if they didn't do it, then if they went and loaded them, they had a right to demand $55 for ten hours before they turned over the freight. Now, as to the alleged contract made with Mr. Culp. The plaintiff here says, according to my recollection, that he didn't think that Mr. Culp was acting within the scope of his authority. He didn't think he had a right to make that contract—he thought he communicated with somebody else. It is incumbent upon the plaintiff to show that Culp had the right to make the new contract or was acting within the scope of his authority. The testimony along that line forces me to believe that he didn't believe that Culp was acting in the scope of his authority. In other words, that Culp had any right to rescind Nichols' contract. Now, what took place between him and Nichols after the train got here? He testified that there was an agreement—he gives his understanding. There is quite a difference between facts and conclusions. If he had stated what the conversation was, then it would have been of great importance, so far as this motion is concerned. I am inclined to think, taking all the testimony in the case, that the motion for a nonsuit should prevail, and I so order."

In other words, the ground of the defendant's motion for nonsuit was that the entire contract was reduced to writing,

and that its refusal to deliver the wood until the plaintiff paid the $55, was neither a violation of its legal duty nor of any contract between the plaintiff and the railway company. The presiding Judge granted the nonsuit on the ground that the written correspondence by which the parties entered into the contract was silent as to the time when the $55 for hauling the wood was to be paid, and that the defendant, therefore, had the right to demand the cash at any time— either before it furnished the cars or before delivering the wood which it hauled for the plaintiff in pursuance of the contract. It will not be necessary to set out the entire correspondence, but only "Exhibit E," which contains the terms of the contract in so far as it was reduced to writing, and is as follows:

"Chester, Sep. 20, 1900.

"York Brick Works, Yorkville, S. C. Dear Sirs: Your favor of the 19th, addressed to L. T. Nichols, has been referred to me for attention. In reply, I will gladly quote you the following rates on wood from McConnells and Lowrys to Yorkville. I will furnish you train, consisting of engine and ten open cars, for $55 for one day of ten hours, $1.25 for each car for each hour to be charged for each hour over ten hours, you to unload and load cars. Please advise if accepted. Yours truly, G. F. Ried, G. F. A."

The pivotal question in the case is whether there was *any* testimony in behalf of the plaintiff, tending to show that the defendant did not have the right to insist upon the payment of the $55 before delivering the portion of the wood which it hauled.

Before considering the testimony to ascertain this fact, we desire to call attention to the following well settled principles: When the written evidence of the contract does not contain all the terms of the transaction between the parties, parol evidence (not contradicting or varying the writing) is admissible for the purpose of showing a contemporaneous independent agreement entered into between the parties. *Chem. Co.* v. *Moore,* 61 S. C., 166. If testi-

mony is received without objection which would otherwise be incompetent, it becomes competent, and cannot be disregarded upon a motion for nonsuit, but its sufficiency must be left to the jury. *Latimer* v. *Trowbridge,* 52 S. C., 193, 29 S. E. R., 637. The written evidence of the contract being silent as to the time in which the money was to be paid, parol testimony was admissible to show such fact, as it did not alter, vary or contradict the writing. The following appears in the testimony of W. N. Ashe, Jr., the plaintiff in the case: "Now, Mr. Ashe, in pursuance of that correspondence, did the railroad furnish you a train? A. They sent a train up here—yes, sir, they furnished us with a train. Q. When was that? A. It was on Friday, the 12th or 11th of October—I forget whether it was the 11th or 12th; that was 1900. Q. State to the jury what took place in connection with that train being turned over to you or you being allowed to have the wood. A. Now, shall I state the conversation between Mr. Culp and myself? Q. Certainly. State everything in connection with your getting the train? A. We were notified possibly a day or two before, at any rate, that we would get the train at this date, and we notified the railroad people that that would suit us; it would be convenient, all right, that we would take the train that day. About 11 o'clock on that day, or possibly a little later, they informed us the train was here. Q. Who informed you? A. Mr. Culp. Q. What position did he occupy? A. He was agent here. Q. He was the agent of the Carolina and North Western Railway Company? A. Yes, sir; I think it was he. I was pretty well satisfied that it came from him— I don't know exactly who informed us that the train was ready for us. I brought up my hands, about thirty, got up the standards and all the paraphernalia necessary to haul the wood. About that time Mr. Culp notified me that the charges for the use of the train would have to be paid in advance, and I told him—(defendant's counsel: If your Honor please, evidently Mr. Ashe wants to state what his understanding of the contract was. The contract is here in

writing for the Court to construe. Mr. Ashe has no right
to interject his understanding of the contract into the mat-
ter). Q. I will ask you this question, Mr. Ashe: Was there
a dispute between you and Mr. Culp as to whether or not
you ought to pay in advance? A. Yes, sir. Q. There was
a dispute? A. Yes, sir. Q. State whether or not he fur-
nished you the train without your paying in advance? A.
Yes, sir. Q. He did? A. Yes, sir. Q. Well, now what
happened? A. We went down the road for the wood. Q.
One minute before you come to that. Did Mr. Culp state
to you or did you state to him when you would pay for the
train? A. As soon as the work was done—that I would
leave the money in the hands of any responsible man he
should mention; but I wouldn't pay it to him as a payment
for train until the work was done. Q. Well, did he give
you the train upon those terms? A. He didn't at first.
He went back to the depot—I don't know what he did—I
am not a telegrapher. At any rate, when he came out of
the room, where the telegraph instrument was, he said it
would be all right; we could take the train and pay for it
when the work was done. Q. State what was done? A.
We went down to the wood pile and loaded the wood up and
started back. When we got to Guthriesville, that was the
second station above, they stopped us at Guthriesville and
sidetracked us, with the information that we couldn't get
farther until $55 was paid. * * * Q. Now, Mr. Ashe, when
Mr. Culp stated that day that he could not let you go out
that day without the payment of $55, you had considerable
conversation with him, you say? A. Not a great deal; for
a few minutes—possibly two or three minutes. Q. How
long did you wait there? A. I don't know, sir; I waited
there until he went around to the office and came back. Q.
Didn't he tell you, Mr. Ashe, when he came back, that he
had no authority to change the contract? A. I don't know,
sir—I don't remember. I told him that if I had to pay in
advance, that I wouldn't take the train; that that was not
specifically stated in this correspondence that we had or this

agreement, and if I had to pay in advance, rather than do that I wouldn't take the train at all. * * * Q. Mr. Ashe, did you ever agree with any official of the narrow gauge railroad, from the president down, to pay $55 in advance? A. No, sir. (Defendant's counsel: It seems that the question of the payment of the $55 depends upon the written contract. Plaintiff's counsel: He has never said that the contract was written. The Court: I have got to construe those letters. That is, the contract with what he has stated verbally. Plaintiff's counsel: We don't contend that that is the contract in its entirety. The Court: I understand your position. You contend that that is part of the contract and the balance with Culp and Nichols. Plaintiff's counsel: Yes, sir; and I want to prove by him whether he agreed to pay $55 in advance. The Court: I think it follows as a matter of law, when a man deals with a railroad and agrees to pay, the money has got to be produced—it is a cash transaction—at least, that has been my experience, it is cash. I will allow you to ask the question. Defendant's counsel excepts). Q. State to the jury whether or not you ever agreed with any official of that road to pay $55 in advance? A. No, sir; I never made any agreement and refused to take the train at all rather than do it."

J. B. Mendenhall, a witness for the plaintiff, testified as follows: "Q. Did you hear any conversation between him and Mr. Culp? A. Yes, sir. Q. What was it? A. About the time the hands all came up and got on the train, Mr. Culp demanded payment for the train before it pulled out from the depot. Mr. Ashe told him he couldn't pay the amount he demanded until the services had been rendered. Q. Well, did he get the train or not? A. Yes, sir; the train left a few minutes after that. Q. Well, now, did you go with the train? A. Yes, sir. Q. Well, just state what you know about it now—what happened? A. We went down to the wood pile below McConnellsville and loaded the wood up and came back to Guthriesville, and the train was stopped at Guthriesville, by the depot agent, I suppose—

it stopped at Guthriesville. The depot agent came out and demanded $55 from Mr. Ashe payment for the train. He refused again to pay it. We stayed there some time and they started up and came to Yorkville."

There was testimony to the effect that the defendant hauled about 50 or 60 of the 106 cords of wood, and that the plaintiff tendered $28.41 to pay the charges for the wood that was hauled; that this was the amount due for the number of hours consumed by the train in hauling the portion of wood just mentioned. The foregoing, as well as other testimony in the record to the same effect, was at least some evidence tending to show that the defendant did not have the right to insist upon the payment of the $55 before delivering that part of the wood which it hauled. If the defendant did not have this right, then its refusal to deliver the wood until the $55 was paid, was in violation of its contract and contrary to law.

These views render unnecessary the consideration of the other exceptions in detail.

It is the judgment of this Court, that the judgment of the Circuit Court be reversed, and the case remanded to that Court for a new trial.